**SOUTHERN MOTOR CARRIERS RATE CONFERENCE, et al., Petitioners,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Respondents.**

No. 84–8499.

United States Court of Appeals, Eleventh Circuit.

Oct. 18, 1985.

Patrick McEligot, Bryce Rea, Jr., Washington, D.C., for petitioners.

Catherine G. O'Sullivan, Marion L. Jetton, Dept. of Justice, Antitrust Div., Washington, D.C., for U.S.

Laurence H. Schecker, I.C.C., Washington, D.C., for I.C.C.

Before TJOFLAT and VANCE, Circuit Judges, and ATKINS *, District Judge.

ATKINS, District Judge:

Petitioners, Southern Motor Carriers Rate Conference, et al. (SMCRC), seek review of a final order of the Interstate Commerce Commission (ICC) promulgating general rules relieving all motor carriers of property and all freight forwarders of the statutory requirement that their tariffs be filed at least 30 days before they become

---

* Honorable C. Clyde Atkins, U.S. District Judge for the Southern District of Florida, sitting by designation.

effective. SMCRC urge that such rules (a) exceed the statutory authority of the ICC, and (b) are arbitrary and capricious.

SMCRC contend that the rules promulgated will deprive interested persons of their statutory right to file protests against carriers' tariffs. They also argue that they will make it impossible for the ICC to reject tariffs that violate the ICC's tariff filing requirements or to exercise its discretion to suspend the effectiveness of tariffs that appear to be unjust, unreasonable, discriminatory, predatory, or destructively competitive.

We find that (1) the plain language of the Interstate Commerce Act, 49 U.S.C. § 10762(d)(1) (1982), empowers the ICC to reduce the notice period for filing tariffs without limitation upon a finding that "cause" exists, (2) the ICC had ample reasons for its finding that cause existed for reducing the notice period, (3) the ICC rules do not abolish the procedure for protest and suspension of independently filed rate increases, and (4) the refusal to suspend rate decreases was rational and in accordance with the law. Accordingly, we affirm.

## I. *Statutory Background*

Motor carriers of property are subject to licensing and rate regulation under the Interstate Commerce Act, 49 U.S.C. § 10101, *et seq.* (1982). Following enactment of the Motor Carrier Act of 1935, Ch. 498, 49 Stat. 543–567 (1935) (codified as amended at 49 U.S.C. § 10762 (1982)), the ICC tightly controlled entry into the motor carrier industry "on the premise that the public interest in maintaining a stable transportation industry so required," *United States v. Drum*, 368 U.S. 370, 374, 82 S.Ct. 408, 410, 7 L.Ed.2d 360 (1962) (footnote omitted).

The ICC also closely regulated motor carrier rates, which were set primarily through collective pricing decisions made in what are known as "rate bureaus." The ICC discouraged rate competition, disallowed rate reductions even when needed to balance a carriers' traffic flow, and relied largely on comparisons with the rates of competing carriers in determining whether motor carriers' rates were just and reasonable. *See, e.g., Carbon Blacks, Southwest to Central and Midwest,* 66 M.C.C. 163 (1955). This rigid ratemaking regulation, combined with the inherent tendency of collective ratemaking to generate "rates that will be compensatory for even the least efficient ... carrier," resulted in a system under which "consumers los[t] the benefit of price competition." H.R.Rep. No. 96–1069, 96th Cong., 2d Sess. 27 (1980), U.S.Code Cong. & Admin.News 1980, pp. 2283, 2309.

Against a background of relaxed standards set by the ICC for entry into the motor carrier industry, an encouragement of rate competition and rate innovation, Congress enacted the Motor Carrier Act of 1980, Pub.L. No. 96–296, 94 Stat. 793 (codified as amended at 49 U.S.C. § 10101(a)(2) (1982) (hereinafter referred to as the "1980 Act"). Congress specifically intended to relax entry regulation and to encourage rate flexibility and competitive pricing in the motor carrier industry. *See* H.R.Rep. No. 96–1069, 96th Cong., 2d Sess. 12 (1980).

In enacting the new motor carrier policy, Congress noted that "[i]t is clearly the Committee's intent that the Commission must recognize the importance of competition and efficiency in motor carrier operations as the most desirable means for achieving national transportation goals and objectives." H.R.Rep. No. 96–1069, 96th Cong., 2d Sess. 12 (1980), U.S.Code Cong. & Admin.News 1980, p. 2294. Specifically, in the rate area Congress' actions furthered its intent that the Commission continue to reduce the potential for regulatory interference with individual motor carrier pricing initiatives. *See* 49 U.S.C. § 10101 *et seq.*

The 1980 Act did not alter the longstanding requirement that carrier rates be reasonable. *Id.* The new law did, however, effect fundamental changes in the carriers' ratemaking procedures and the Commission's regulatory procedures to reflect Congress' plainly expressed intent that "motor carriers [be given] greater freedom to set rates in the response to market demands," H.R.Rep. No. 96–1069, 96th Cong., 2d Sess.

4 (1980), U.S.Code Cong. & Admin.News 1980, p. 2286.

The major change in the carriers' ratemaking procedures resulted from the 1980 Act's substantial reduction in the role of collective bargaining. In Section 14 of the 1980 Act (principally codified at 49 U.S.C. § 10706(b)), Congress restricted rate bureau activities to encourage "competitive pricing" and to "put a greater burden upon individual carriers to determine their own cost structures and the most optimum rates from their individual company point of view to offer the shipping public." H.R.Rep. No. 1069, 96th Cong., 2d Sess. 28 (1980), U.S.Code Cong. & Admin.News 1980, p. 2310. Congress also established a Motor Carrier Ratemaking Study Commission to report to Congress and recommend further legislative changes. 49 U.S.C.A. § 10706.[1]

The 1980 Act also reduced the Commission's authority to interfere with independently established motor carrier pricing initiatives. Historically, the Commission has had (and continues to have) two principal avenues by which it can enforce the rate provisions of the Act. First, it *must* adjudicate formal complaints alleging that motor carrier rates currently in effect are not reasonable. *Southern Railway v. Seaboard Allied Milling Corp.*, 442 U.S. 444, 454, 99 S.Ct. 2388, 2394, 60 L.Ed.2d 1017 (1979). Second, the Commission has the discretion to suspend (*i.e.*, enjoin) and/or investigate proposed rates before they become effective. The most significant change that the 1980 Act made to the Commission's regulatory authority was the creation of a "zone of rate freedom" (ZORF) 49 U.S.C. § 10708(d). While not altering the Commission's duty to adjudicate formal complaints concerning rate reasonableness, Congress sharply curtailed the Commission's discretion to suspend individually set rates that fell within the liberally defined ZORF. In short, ZORF was designed to encourage individual marketplace pricing. The congressional report states:

> The new zone of rate freedom in subsection (d)(1) applies only to rates proposed

by individual carriers.... This section must be read in conjunction with Section 14, which specifically prohibits collective ratemaking for rates established pursuant to this new subsection....

The thrust of this new subsection is to provide for more pricing freedom and less government regulation and to balance freer entry into the industry, freer expansion of the industry, and the additional competition that will result from other provisions of the bill. The concept, then, is to spur competition both in service and in pricing. Plainly, the intent is to give the carriers and the shipping public the ability to structure their transportation systems and needs around a variety of service and price options. Another anticipated impact is that, by separating the new pricing flexibility from collective ratemaking with its attendant antitrust immunity, the carriers will establish many of their rates independently of one another. This will create a more competitive motor carrier system.

H.R.Rep. No. 96–1069, 96th Cong., 2d Sess. 24, 25 (1980), U.S.Code Cong. & Admin. News 1980, pp. 2306, 2307.

## 1. *Statutory Authority to Reduce Notice Period*

Since the inception of motor carrier regulation, the Interstate Commerce Act has provided that motor carriers must file tariffs with the Commission 30 days in advance of the effective date of the tariff. *See* Motor Carrier Act of 1935, ch. 498, 49 Stat. 543–567 (1935) (codified as amended at 49 U.S.C. § 10762(d)(1) (1982). The 1935 Act provided that the Commission could reduce the notice period, or modify other tariff filing provisions of the Act:

> The Commission may, in its discretion and for good cause shown, allow such change [in tariffs] upon notice less than that herein specified or modify the requirements of this section with regard to posting and filing of tariffs either in particular instances or by general order

---

**1.** On June 1, 1983, the Study Commission issued its report recommending the total elimination

of antitrust immunity for motor carrier ratemaking.

applicable to special or peculiar circumstances or conditions.

49 U.S.C. § 317 (1935).

In 1978, Congress recodified the Interstate Commerce Act, but the recodification was not meant to effect any substantive changes. Enacting Section 217(c) as 49 U.S.C. § 10762(d)(1). The new language still enabled the Commission to reduce the notice period for filing tariffs, but now read:

> The Commission may reduce the notice period of subsections (a) and (c) of this section if cause exists. The Commission may change the other requirements in this section if cause exists in particular instances or as they apply to special circumstances.

49 U.S.C. § 10762(d)(1).

### 2. *The Proceedings Before the ICC*

In July 1983, the ICC proposed to reduce the notice period for independently filed motor carrier rates from the 30 days specified in 49 U.S.C. § 10762(c)(3), to one day for rate reductions, and five days for rate increases. 48 Fed.Reg. 34,307 (1983) (hereinafter cited as *"NPR"*).

In the *NPR*, the ICC noted that the 30-day notice requirement "was part of a pervasive regulatory framework which in many ways promoted rate uniformity and inhibited entry into the industry." *Id.* The agency found, however, that the framework had changed significantly:

> By contrast, the [1980 Act] significantly promoted rate flexibility and relaxed entry standards. One result has been an upsurge in rate and service competition among carriers. As the competitive nature of the industry has changed, a carrier's ability to respond to new market demands free of unnecessary regulatory interference has taken on increased importance. The failure to act promptly can mean the permanent loss of existing traffic to a competitor or an inability to attract new traffic. The vast number of special permission applications for short notice rate effectiveness that have been filed with the Commission in recent months is only one indication of the need for quick response to competitive pressures. In these circumstances, we believe the current notice requirements constitute a significant burden on individual carriers and on the industry as a whole, and limit the price/service options available to shippers at any given moment.

*Id.*

The ICC stressed the substantial benefits motor carriers would realize from the change in the notice period, *viz.* increased flexibility to implement marketing strategies to respond to competitive situations. It also noted the benefits to shippers by increasing their ability to secure service at competitive rates without delay.

The ICC addressed the impact of reducing the notice period to the proposed levels. It relied upon the existence of the complaint remedy as the prime mechanism to ensure that rates could be challenged as unreasonable. Moreover, it noted that "in this highly competitive arena, carriers would be ill-advised to raise rates significantly without first advising and discussing the matter with the shippers." *Id.* The agency concluded:

> The marketplace is a more effective regulator of unreasonably high rates than this Commission. To the extent the Commission can play an effective role in this area, the *ex post* complaint process usually offers a more useful forum than the more summary investigation and suspension procedure.

*Id.*

This conclusion reflected the ICC's experience with protests to motor carrier rates which indicated that protests are rarely successful. *See, id.*

Numerous comments were filed by the public. In general, shippers supported the proposal, although some proposed that longer notice be allowed for rate increases. All of the individual motor carriers who commented also supported the concept of reduced notice. Both the United States Department of Justice ("DOJ") and the Department of Transportation ("DOT") strongly supported the Commission's initiative. Only rate bureaus and other carrier

associations generally opposed the proposal. *Id.*

In May 1984 the Commission issued its final rules reducing the notice period for independently filed motor carrier rates. 49 Fed.Reg. 22,095 (1984). The Commission first affirmed its statutory authority to reduce the notice period for filing motor carrier tariffs. While several commentators had contended that Section 10762(d)(1) only permitted reduction of the notice period for filing tariffs on a case-by-case basis, or by blanket notice when special circumstances are shown, the ICC rejected this argument relying on the plain language of the statute (which states that only "cause" is needed for the reduction of the notice period for filing tariffs). The ICC went on to state that even if the commentators' arguments were correct, the new competitive environment satisfied the statutory requirement of special circumstances. *Id.*

The ICC then turned to the merits of its proposal and concluded that there was "cause" for the restriction of the notice period for filing independent motor carrier and freight forwarder rates. The ICC found cause in the benefits that would flow from the reduction of the notice period. Specifically, it ·found that the proposal would permit common carriers to compete effectively with contract carriers (who need not file tariffs at all), deregulate rail services (*i.e.*, TOFC/COFC service), and benefit the smaller carriers and shippers by allowing greater flexibility in marketing strategies and leverage with carriers. Moreover, the proposal was found to be beneficial to the ZORF rate filings, which involve rates that cannot be suspended or investigated by the Commission. *See* 49 U.S.C. § 10708(d). The ICC's findings about benefits were not speculative, but were supported by the comments in the record.

Having found substantial benefits from its proposal, the ICC examined the proposal to determine whether the burdens outweighed the benefits, and it concluded that they did not. It rejected the arguments of those commentators who felt that the proposal was undesirable because it would eliminate the ability to protest tariffs before the rates went into effect. The agen-

cy concluded that "a 30-day notice requirement for independently filed rates should not be maintained merely to preserve the current levels of ability to protest these rates." 49 Fed.Reg. 22,095. The ICC reasoned that:

> The chances of anticompetitive rates are so remote that it is unlikely that letting a rate change take effect will cause any significant harm. Decisions on whether to suspend or investigate a tariff filing are necessarily made on a limited record because Commission action must be taken before the tariff becomes effective. By contrast, as noted by [the Department of Justice], evidence to assess whether a rate is unlawful is more readily available after it becomes effective.

*Id.*

It continued

> We simply cannot find that the benefits of expedited rate effectiveness should be denied to shippers and carriers on several hundred thousand annual independent rate filings merely to insure access to a seldom used protest remedy, especially when the complaint remedy remains available. Nevertheless, the protest remedy is still available for rate increases under the regulations we are adopting here. When protests or increases filed on seven working days notice are filed, we will resolve the question of suspension and investigation before the tariff matter becomes effective.

*Id.*

The ICC recognized that the burden of proof is switched in a complaint proceeding as opposed to a suspension proceeding, but nevertheless concluded that "the complaint remedy (with reparations available through the courts) is a vastly more effective procedure than protests with respect to independently filed rates." *Id.* These conclusions noted, its records reveal that "shippers and carriers themselves recognize that the protest remedy is of extremely limited utility." *Id.* The agency's records revealed that of the thousands of tariffs filed in fiscal year 1983, only 40 protests were filed and only three tariffs were suspended. *Id.*

Based on the public comments, the ICC concluded that the proposed five days notice for rate increases was insufficient. Numerous shippers had opposed this period, and suggested several other options. The ICC then adopted a seven working days notice period for rate increases. This new period eliminated the problems that would have arisen from weekend inclusion in the calculation of the period, and sufficient time for the agency to process the tariffs. Further:

A 7 work day as opposed to a 5-day notice period should also assist small shippers in dealing with any difficulties in the transition to shorter notice periods and facilitate adjustments by shippers using computerized same-day billing procedures. A 7 work day notice period for rate increases will also make it easier for any shipper faced with unacceptable rate increases to secure alternate transportation services. On the other hand, a 7 work day notice period for rate increases appears to be the maximum period possible if carriers are not to be discouraged from filing rate reductions on 1-day's notice. Adoption of a 7 work day minimum requirement for rate increases thus best balances the legitimate interests of shippers and carriers.

*Id.*

Petitioner rate bureaus sought review and a stay of the ICC's rules. Both the ICC and this court declined to stay the effective date of the rules, and on June 25, 1984, the rules became effective.

II. *The Reduction of the Notice Period for Filing Tariffs by Motor Carriers Was Proper*

In the subject proceeding, the ICC reduced the 30-day notice period for filing motor carrier rates required by 49 U.S.C. § 10762(c)(3) to one day for independent action reduction and to seven working days for independent action increases. The action taken was under the authority specifically granted by 49 U.S.C. § 10762(d)(1) to reduce the notice period "if cause exists." Petitioners urge the ICC's action exceeds its authority because that section does not permit a general reduction of the notice

period except in "special or peculiar circumstances," which they contend do not exist here. Their argument is flawed because it relies on a misreading of both the current version of the Interstate Commerce Act and its predecessor section in the Motor Carrier Act of 1935. The language of the statute and its legislative history fully supports the ICC's view that it needed only to find cause for reducing the notice period.

1. *Scope of Review*

■ The scope of review of the ICC's interpretation of its statute is extremely narrow. Where, as here, the agency is interpreting its own statute in a technical and complex area, its interpretation should be sustained if it is reasonable and a permissible construction of the statute. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* —— U.S. ——, 104 S.Ct. 2778, 2782–83, 2793, 81 L.Ed.2d 694 (1984); *Aluminum Co. of America v. Central Lincoln Peoples' Utility Dist.,* 467 U.S. 380, 104 S.Ct. 2472, 2480, 81 L.Ed.2d 301 (1984); *See, FCC v. WNCN Listeners Guild,* 450 U.S. 582, 598, 101 S.Ct. 1266, 1276, 67 L.Ed.2d 521 (1981). The Supreme Court has consistently stated:

The Court need not conclude that the agency's construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding.

*Chevron U.S.A. Inc.,* 104 S.Ct. at 2782.

2. *The Plain Language of the Statute Supports the ICC Action*

Section 10762(d)(1) permits the ICC to reduce the notice period specified in Section 10762(c)(3) "if cause exists." There is no express or implied limitation in the statute concerning the type or duration of the reduction that may be granted. The ICC's interpretation of what is necessary for a notice reduction simply reflects the plain statutory distinction.

The above section is the recodification of Section 217(c) of the Motor Carrier Act of

1935, former 49 U.S.C.A. § 317(c). That section read, in relevant part:

The commission may, in its discretion and for good cause shown, allow such change [in rates] upon notice less than that herein specified or modify the requirements of this section with respect to posting and filing of tariffs either in particular instances or by general order applicable to special or peculiar circumstances or conditions.

Thus, the language of the old statute contained the same distinction present in the current statutory language; the first part of the quoted material referred to notice reductions (which could be granted "for good cause shown") while second part (*i.e.*, the part after the word "or") referred to posting and filing requirements (which could be altered case by case or generally upon a showing of special circumstances).

The old statute's legislative history confirms that the language imposed different requirements for notice period reductions on the one hand, and other tariff rules on the other. Senator Wheeler, one of the sponsors of the Motor Carrier Act of 1935, explained:

No change may be made in any tariff except after 30 days' notice, but the Commission may, in its discretion and for good cause shown, allow such change upon less notice, as it often does in the case of the railroads. [The Commission] may modify the requirements with respect to posting and filing of tariffs either in the particular instance of by general order applicable to special circumstances or conditions.

79 Cong.Rec. 5656 (April 15, 1935).

From the language of the statute and its legislative history, it is clear that the Commission had broad discretion to reduce the notice period as it saw fit, without restriction as to the scope of such an order. In the words of both the statute and the congressional explanation of the statute, the Commission needed only make a finding of "good cause" to reduce the notice period.

The Congressional Report on the recodification of the Interstate Commerce Act in 1978 further confirms that Congress intended to grant the Commission broad discretion to reduce the notice period for tariff filings upon a showing of cause. In H.R. Rep. No. 95–1935, 95th Cong., 2d Sess. 107 (1978), Congress explained the transformation of the language of former Section 217(c) into the present Section 10762(d)(1):

In subsection (d), the words "The Commission may reduce the 30-day period of subsections (a) and (c) of this section" are substituted for "the Commission may ... allow changes upon less than the notice herein specified" for clarity. The words "in its discretion" are omitted as surplus. The words "change the other requirements of this section" are substituted for "modify the requirements of this section in respect to publishing, posting, and filing of tariffs" for clarity. The words "in particular instances or as they apply to special circumstances" are substituted for "either in particular instances or by a general order applicable to special or peculiar circumstances or conditions" because of the general authority to prescribe regulations under section 10321(a) of the revised subtitle.

This language simply carried forward the distinction present in former Section 217(c), which allowed the notice period to be altered upon a showing of cause, while modification of the statutory requirements regarding publishing, posting, and filing of tariffs must be effected only "in particular instances or as they apply to special circumstances."

The recodification had no substantive effect on the law; the old and new versions are substantially identical. This being the case, either the new or the old versions of the statute provides an equally valid basis for determining the statute's meaning. The petitioners concede that the new version only requires "cause" for the notice reduction. Accordingly, that must also have been the meaning of the earlier version of the law.

Petitioners seek to create an ambiguity as a means to engraft the more restrictive requirements of the second sentence of section 10762(d)(1) onto the simple, direct, and

broad grant of discretion to the Commission to reduce the notice period for filing motor carrier tariffs upon a showing of cause. We rejected this effort in *American Trucking Associations, Inc. v. ICC*, 672 F.2d 850, 853 (11th Cir.1982), and do so here.

We hold Section 10762(d)(1) gives the ICC discretion to reduce the notice period for filing motor carrier tariffs, including the authority to accomplish this in a generally applicable rule as was done here.

### 3. *Cause to Reduce the Notice Period was Properly Found By the ICC*

Petitioners urge, and we agree, that the ICC must find cause under the statute before the notice period for independently filed motor carrier tariffs can be reduced. However, the subject statute, Section 10762(d)(1) does not define what constitutes "cause," and the legislative history of the statute is of no assistance.

In proposing an amendment, which was adopted in 1906, permitting the ICC to reduce the rigid 30-day notice period, the ICC commented:

> The aim is to give this section adaptability to commercial conditions and business requirements, which ought not to be subjected to one unvarying requirement.
>
> Previously, the tariffs had to be filed on 30 days' notice only, with no possibility of relief. In its request, the ICC clearly recognized that adapting to competitive conditions would be appropriate reason for reducing the notice period.

19 I.C.C.Ann.Rep. 8 (1905).

Implicit in the ICC's decision is reliance upon the changed competitive situation to support its challenged action. To illustrate, the ICC identified "the dramatic upsurge in rate and service competition among carriers since passage of the [Motor Carrier Act of 1980] and the increased importance of carriers being able to respond to new market demands free of unnecessary regulation." 49 Fed.Reg. 22,095 (1984). The ICC commented that both large and small carriers would be benefitted by the new rules, and that small shippers would be able to adjust to the new flexibility carriers would have under the rules. The public comments, cited by the ICC, generally supported its initial conclusions in its notice of the proposal that both shipper and carriers would benefit from the proposal to reduce the notice period. The comments of the Department of Justice are supportive of the ICC action:

> First, a notice period slows the responsiveness of trucking firms to changes in demand or cost conditions. Second, a notice period may discourage (and thus make less likely) certain types of rate changes. In both cases, the effect of requiring notice is to make it more likely that the rates charged are higher or lower than the competitive equilibrium level. Such an imbalance, even for a short period, results in an inefficient output reduction.

*Id.*

### 4. *The Adequacy of the Notice Period*

Originally, the ICC had proposed that rate increases be allowed on only five days' notice. Responding to invited comments, the ICC increased the notice period proposed in the *NPR* from five days to seven working days. In doing so, it noted that use of the longer period would enable time for filing, processing, and protesting independent rate increases, and eliminate problems that would have occurred if a tariff were filed to become effective with an intervening weekend period.

### 5. *Petitioners' Contentions*

Petitioners advance three arguments against the ICC's "cause" finding. First, petitioners contend that the ICC erred because its finding is grounded solely on "policy." We believe the ICC's finding was amply supported by facts supplied by the many carrier and shipper participants, and that it was appropriate for the ICC to have considered "policy," because the agency must exercise its regulatory authority "to promote competitive and efficient transportation services...." 49 U.S.C. § 10101(a)(2). Thus, the ICC's decision was an action applying a policy supported by the record and by the ICC's experience.

■ Petitioners next contend that "general conditions" cannot constitute cause. However, the ICC has previously notice reductions based on general conditions.[2] Thus, the ICC has recognized, as one standard for general reductions in the notice period, the need to react to general changes in competitive situations. Moreover, petitioners cite no authority to support their assertion that a generally prevailing competitive climate cannot justify steps to assure that everyone operating in that climate can compete to the maximum extent possible.

■ Finally, petitioners argue that the ICC treated the "good cause requirement" merely as a "formality." We find no merit in this claim, because the record indicated that the ICC thoroughly examined this requirement.

III. *The Action of the ICC on the Suspension Process is Rational and Consistent with the Statute*

1. *The ICC Rules Preserve the Right of Protest and Suspension of Independently Filed Rate Increases*

■ Petitioners fail to distinguish between the two actions taken by the ICC in reducing the notice period for rate increases and for rate reductions. Their argument that the reduction of the notice period for rate increases abdicate the agency's suspension power is misplaced. As the Commission observed:

Nevertheless, the protest remedy is still available for rate increases under the regulations we are adopting here. When protests of increases filed on 7 workdays' notice are filed, we will resolve the question of suspension or investigation.

*See* NPR.

The ICC thus made it clear that it would continue to entertain and rule on protests seeking suspension and investigation of independent rate increases. We find no support for the "abuse of discretion" the rate bureaus assert in arguing that the suspen-

sion process is barred in rate increase instances. *cf. Nader v. CAB*, 657 F.2d 453, 458 (D.C.Cir.1981).

The ICC carefully provided that sufficient time is available for the filing and consideration of protests within the time allotted under the short notice rules for rate increases. It increased the notice period from the original five days proposed to seven working days to "eliminate the problems created by inclusion of weekends in the notice period." It also mandated "priority handling of pleadings in these cases" to guarantee that protests would be properly processed and decided. We note the ICC envisioned the continued ability of interested parties to protest independent rate increases.

The record supports the conclusion that the ICC will and does entertain such protests. Since the inception of the rules on review here (June 25, 1984), one protest for an independently filed motor carrier rate increase has been filed. The Columbian Storage and Transfer Co. filed Supplement 86 to its Tariff MWB 125–J, Item 750–85–1, increasing delivery charges by $15.00 per shipment. The tariff was filed on August 10, 1984, effective August 21, 1984—seven working days' notice. This rate increase by an independent motor carrier was protested by the National School Supply and Equipment Association, and, in Suspension Case No. 71194, the ICC's Suspension Board declined to suspend the proposed rate. The Board acted on August 20, 1984, one day before the rate was to go into effect. Thus, the ICC was able to exercise its discretion fully and decline to suspend the rate. We hold that the suspension process was not abdicated.

2. *The Preclusion of Suspension of Independently-Filed Rate Reductions is Entirely Rational and in Accordance with the Law*

Petitioners contend that the ICC's rules are unlawful because Congress gave the

---

**2.** In Special Tariff Authority No. 83–9530 (May 24, 1983), discussed in *American Trucking Associations, Inc. v. United States*, 688 F.2d 1337, 1347, and in the ICC's decision in this case, the

ICC reduced the notice period for rate bureaus to file tariffs on short notice in response to their carriers' rate reductions.

agency discretion to suspend rates, but the agency indicated that in rate reduction cases the effect of the one-day notice would be to preclude suspension. Thus, petitioners argue that the Commission has thrown away its principal tool (the suspension process) for the discharge of its duty to see that rates are just and reasonable.

It is an established rule that an agency must be given substantial latitude in determining how to implement a statutory mandate. As long as an agency's procedures are reasonably designed to permit the agency to "discharge [its] multitudinous duties," a court should not interfere. *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 543–46, 98 S.Ct. 1197, 1211–13, 55 L.Ed.2d 460 (1978). There is no statutory directive to use the suspension process, rather than the complaint process, to determine whether trucking rates are below a minimum reasonable level, *cf. Southern Railway v. ICC*, 681 F.2d 29, 35 (D.C.Cir.1982). Accordingly, the effect of the ICC's rules clearly were not contrary to and were in furtherance of the statutory design.[3] *See Trans Alaska Pipeline Rates Cases*, 436 U.S. 631, 653, 98 S.Ct. 2053, 2066, 56 L.Ed.2d 591 (1977); *cf. Nader*, 657 F.2d at 458 ("It therefore follows that the Board, retaining *discretion not to suspend* fares falling outside the statutory zone, could announce a policy of limited risk of suspension....") (emphasis in original); *accord, Advanced Micro Devices v. CAB*, 742 F.2d 1520 (D.C.Cir.1984).

In its notice of proposed rules and in its final rules, the ICC explained that

it is unlikely that any motor carrier rate reduction could be successfully challenged prior to its effective date on the grounds that it results in an unreasonably low rate. Predation is a highly improbable, if not impossible, pricing strategy in view of the competitive posture of the motor carrier industry. Discrimination may be unlawful but, like predation, unreasonable discrimination is almost impossible to prove before the rates actually become effective.

The ICC continued:

[t]he benefits of reduced notice periods for independent rate filings should not be withheld because of a speculative concern for problems with a very few filings, which in any event can be better dealt with in the *ex post* complaint process than by protest.

*See, e.g., NPR.*

The ICC has indicated that it will wait until the rates have gone into effect and, upon complaint by an affected party, will consider the challenge to those rates. We find this approach to regulation of independent motor carrier rates is rational and consistent with the Interstate Commerce Act and the 1980 Motor Carrier Act.

Under the Interstate Commerce Act, a complaint may be filed against a carrier alleged to be violating the Interstate Commerce Act. 49 U.S.C. § 11701(a). If that carrier is found to be violating the Act by charging, for example, an unjust or unreasonable rate, the injured carrier may obtain damages. 49 U.S.C. § 11705(b)(3). This is certainly an adequate remedy and mechanism for enforcing the just and reasonable rate requirements of the Act.

As the Supreme Court observed in *Southern Railway*, 442 U.S. at 454–55, 99 S.Ct. at 2394–95, the complaint remedy is available to challenge existing rates and, although the burden of proof is different in the case of suspension and investigation of a rate and limits damages to actual damages, "neither ... necessarily affects any citizen's ultimate rights." *Id.*

The ICC's rationale that the best way to assess allegations of predation is in the complaint process rather than in the suspension process is entirely rational, sup-

---

**3.** In the congressional report, the Committee observed that former ICC Chairman Darius Gaskins testified that more rate flexibility would benefit carriers, shippers, and the consuming public. He stated: rate flexibility "would allow carriers to carry on the vast majority of their day-to-day pricing without unnecessary interference by the Commission.... The legislators stated: "The Committee, in accepting a policy of more service competition and more pricing flexibility, has evinced substantial agreement with these views."

ported by the record, and thus not arbitrary or capricious.

Under the old rules, a motor carrier tariff became effective on 30 days' notice or less, and under the ICC's suspension regulations at 49 C.F.R. 1132.1(a), all protests had to be filed not less than 12 days before the tariff's proposed effective date. Under 49 C.F.R. 1132.1(i), the ICC generally would act upon petitions for suspension not less than five days before the proposed effective date. The result was that a reply would have to be filed, and the ICC would have to consider the matter within a period of one week.

The regulation was onerous. The only way that the carrier proposing the discount—probably the more efficient carrier—could present its actual costs for a particular operation, within the short time provided for a reply, would be by preparing a full, individualized cost justification in advance each time that it intended to propose a new discount rate. This would clearly be contrary to the purpose of the 1980 Act and would discourage and effectively preclude many carriers from filing discount rates. For that reason, the Commission has consistently concluded, and we agree, that the principal objective of the petitioners has been to inhibit legitimate price competition.

As we recognized in *Malcolm v. Marathon Oil*, 642 F.2d 845 (5th Cir.1981), a basic assumption underlying any case of predation is the fear that a monopoly or dominant firm will deliberately sacrifice present revenues for the purpose of driving rivals from the market and then recoup its losses through higher profits earned in the absence of competition. As the Commission found, however, monopoly and, thus, predation are highly unlikely in the motor carrier industry, because there are virtually no entry barriers and, accordingly, carriers competing with a predator can simply shift their operations until the predator attempts to raise its price. *See NPR.* For that reason, even if a predator could keep its rates down long enough to drive out its competitors, the spectre of new competitive constraints would preclude it from raising its price high enough or long enough to recoup the losses sustained during the predation period.[4]

We find these conclusions are rational, supported by the record, and fully justified the ICC's choice of how to exercise its entirely discretionary suspension power.

We AFFIRM the action of the Interstate Commerce Commission.

---

**4.** We note that the ICC's rules require seven business days' notice for increases and thus permit the ICC to suspend a rate increase by a potential predator, if a predatory strategy was advanced to that stage.