FLORIDA KEY DEER, (*Odocoileus virginianus clavium*), Henry Lee Morgenstern, National Wildlife Federation, Florida Wildlife Federation, and Defenders of Wildlife, Plaintiffs,

v.

Wallace E. STICKNEY, in his official capacity as Director of the Federal Emergency Management Agency, an agency of the United States of America, Defendant.

No. 90–10037–CIV.

United States District Court, S.D. Florida.

Aug. 25, 1994.

**1224**

Henry Lee Morgenstern, Key West, FL, David J. White, William Robert Irvin, National Wildlife Federation, Atlanta, GA, for plaintiffs.

Joseph R. Perella, Environment and Natural Resources Div., U.S. Dept. of Justice, Washington, DC, Teresa J. Davenport, Asst. U.S. Atty., Miami, FL, for defendant.

### MEMORANDUM OPINION

K. MICHAEL MOORE, District Judge.

THIS CAUSE came before the Court upon Plaintiffs' application for declaratory and injunctive relief under the Endangered Species Act, 16 U.S.C. sec. 1531, *et seq.* Plaintiffs seek judicial determination that Section 7(a)(2) of the Endangered Species Act requires the Federal Emergency Management Agency to consult with the United States Fish and Wildlife Service to determine whether the agency's actions in administering the National Flood Insurance Program in Monroe County, Florida are not likely to jeopardize the continued existence of the endangered Key deer. The case was tried before the Court in Key West, Florida. This Memorandum Opinion and Final Declaratory Judgment follows:

### Nature of the Action

In this suit, Plaintiffs seek to compel the Defendant Federal Emergency Management Agency (FEMA) to comply with its obligations under the Endangered Species Act (ESA), 16 U.S.C. §§ 1531 *et seq.*, to insure, in consultation with the U.S. Fish and Wildlife Service (USFWS), that its actions in administering the National Flood Insurance Program (NFIP) in Monroe County, Florida, are not likely to jeopardize the continued existence of the endangered Florida Key deer.

Plaintiffs seek declaratory and injunction relief requiring FEMA to consult with the USFWS, pursuant to Section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), to determine the effects of the NFIP in Monroe County on the endangered Key deer, and, subsequent to consultation with the USFWS, to the Key deer pursuant to FEMA's obligations under ESA Section 7(a)(1), 16 U.S.C. § 1536(a)(1).

### Standing

██ In order to demonstrate standing under the constitutional test for standing, Plaintiffs must show three elements: (1) that they have or will suffer some injury in fact, (2) that the injury is "fairly traceable" to the conduct of the Defendant, and (3) that the Court has the power to redress the injury. *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979); *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 38–41, 96 S.Ct. 1917, 1924–26, 48 L.Ed.2d 450 (1976).

██ The desire to use or observe an animal species, even for purely aesthetic purposes, is a cognizable interest for purposes of standing. *Lujan v. Defenders of Wildlife,* —— U.S. ——, ——, 112 S.Ct. 2130, 2137, 119 L.Ed.2d 351 (1992) (citing *Sierra Club v. Morton,* 405 U.S. 727, 734, 92 S.Ct. 1361, 1366, 31 L.Ed.2d 636 (1972)).

██ The Plaintiffs have demonstrated, and FEMA does not dispute, that Plaintiffs have and will continue to suffer "injury in fact" by virtue of the following: that Plaintiffs and their members derive scientific, recreational, and aesthetic benefit and enjoyment from the existence in the wild of the Key deer (Final Stipulation of Facts, at 6–8, ¶¶ 8–12, 15); that Plaintiffs' interests in the recovery of the Key deer are current and continual (*Id.* ¶ 15); that the interests of Plaintiffs and their members would be impaired if the population of the Key Deer continues to decline (*Id.*); that the population of the Key Deer is in fact in decline (*Id.* ¶ 3), and; that the Key deer is currently being harmed by new development (*Id.* ¶¶ 3, 16, 18–19). These undisputed facts demonstrate that Plaintiffs and their members have and are continuing to suffer "injury in fact."

Injury in fact also arises in this case from FEMA's failure to carry out statutorily-mandated procedures in a manner that impairs Plaintiffs' interests in the conservation and

recovery of the Key deer. Courts have recognized that failure to comply with required procedures under similar circumstances may constitute injury in fact. *See, e.g., National Wildlife Federation v. Hodel,* 839 F.2d 694, 712 (D.C.Cir.1988); *Thomas v. Peterson,* 753 F.2d 754, 764 (9th Cir.1985) (failure to prepare a biological assessment constitutes a procedural violation causing irreparable harm entitling plaintiff to relief); *Munoz–Mendoza v. Pierce,* 711 F.2d 421, 428 (1st Cir.1983); *City of Davis v. Coleman,* 521 F.2d 661, 670–72 (9th Cir.1975). When FEMA violated the ESA by failing to consult with the USFWS, these procedural violations gave rise to an injury to Plaintiffs as individuals and organizations whose members observe and enjoy the continued existence of the Key deer in its native habitat.

Plaintiffs need not prove conclusively that there is a direct cause and effect relationship between the availability of federal flood insurance and development, or that federal flood insurance is a major cause of the development that causes harm to the Key deer. Rather, Plaintiffs must only make a showing that there is a "substantial likelihood" that the injury is "fairly traceable" to Defendant's act or omission, and a "substantial likelihood" that the relief requested will redress the injury claimed. *Duke Power Company v. Carolina Environmental Study Group,* 438 U.S. 59, 75 n. 20, 98 S.Ct. 2620, 2631 n. 20, 57 L.Ed.2d 595 (1978).

Individuals and organizations have standing to enforce procedural rights so long as the procedures in question are designed to protect some threatened concrete interest that is the ultimate basis of their standing. *Lujan,* — U.S. at — n. 8, 112 S.Ct. at 2143 n. 8. As noted by the *Lujan* Court:

There is this much truth to the assertion that "procedural rights" are special: The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy. Thus, under our case-law, one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an Environmental Impact Statement, *even though he cannot establish with any certainty that the Statement will cause the license to be withheld or altered,* and even though the dam will not be completed for many years. (That is why we do not rely, in the present case, upon the Government's argument that, even if the other agencies were obliged to consult with the [FWS], they might not have followed [its] advice.) What respondents' "procedural rights" argument seeks, however, is quite different from this: standing for persons *who have no concrete interests affected—persons who live (and propose to live) at the other end of the country from the dam.*

*Id.* at — — — n. 7, 112 S.Ct. at 2142–43 n. 7 (emphasis supplied).

In the instant case, Plaintiffs are akin to the people who live next to the dam site in the *Lujan* Court's above-cited example. FEMA has conceded that Plaintiffs and/or their members actually live in or visit Big Pine Key and the surrounding area, enjoy the existence of the Key deer in the wild, and intend to continue such activities in the future. *Final Stipulation of Fact,* at 7–8, ¶ 10. This is not a case of persons seeking to enforce some abstract, self-contained, non-instrumental right to have all agencies observe procedures required by law; FEMA's refusal to follow procedural requirements hits the Plaintiffs—and the Key deer—in areas where they live, visit, study, and recreate on a regular and continual basis. Plaintiffs have a procedural right because their concrete interests in the Key deer are at stake.

Plaintiffs have met their burden of demonstrating a substantial likelihood that a causal relationship exists between the availability of flood insurance and the rate or amount of new development.

In the context of Plaintiffs' claim relating to FEMA's procedural violation of Section 7(a)(2), Plaintiffs' must show only that FEMA has failed to initiate consultation as required by the ESA. *Thomas,* 753 F.2d at 763 (failure of a federal agency to comply with Section 7 procedural requirements is a violation of the substantive mandate of the ESA). In maintaining a cause of action

against a federal agency for failure to comply with a non-discretionary procedural requirement of the ESA, the burden on the plaintiff is merely to show that the circumstances triggering the procedural requirement exist, and that the required procedures have not been followed. *Id.* at 765. FEMA's refusal to initiate consultation with the USFWS violates the procedural requirements of Section 7(a)(2) of the ESA and therefore impairs concrete interests of the Plaintiffs *i.e.,* the recovery of the Key deer.

To demonstrate standing to challenge FEMA's substantive violation of Section 7(a)(2), Plaintiffs must only show that there is a "substantial likelihood" that the actions of FEMA in administering and implementing the NFIP in Key deer habitat in any way facilitates, encourages, or makes development more likely than would be the case without flood insurance, either directly or indirectly, thereby crossing the "low threshold of possible effect." *Romero–Barcelo v. Brown,* 643 F.2d 835, 857 (1st Cir.1981).

The evidence presented in this case clearly demonstrates that there is more than a substantial likelihood of cause and effect between federal flood insurance and new development, especially where, as demonstrated *infra,* FEMA provides the only commercially available flood insurance in Key deer habitat. The Court finds that Plaintiffs have met the "fairly traceable" element on the constitutional test for standing.

■ The constitutional element of redressability is likewise not an impediment to Plaintiffs' standing in this cause. As noted by the Supreme Court in *Lujan v. Defenders of Wildlife:*

> There is this much truth to the assertion that "procedural rights" are special: The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy.

*Lujan,* —— U.S. at —— n. 7, 112 S.Ct. at 2142 n. 7.

The injury to Plaintiffs' procedural interests can be redressed by requiring FEMA to recognize its obligations under the ESA, initiate consultation with the USFWS, and undertake a detailed review of implementation of the NFIP within the habitat of the Key deer. Redressability for FEMA's substantive violations of Sections 7(a)(1) and (a)(2) can likewise be achieved by a declaration by this Court that FEMA has an obligation under the ESA to both insure that its actions are not likely to harm the Key deer, and that it has an obligation to utilize its authorities to participate in the federal effort to protect the Key deer. Accordingly, based upon the evidence presented at trial in this action, as discussed, *infra,* the Court finds that FEMA has such an obligation under the ESA to consult with the USFWS regarding the effect of the NFIP within the habitat of the Key deer.

### Endangered Species Act Introduction

The United States Supreme Court observed the Endangered Species Act to be "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 180, 98 S.Ct. 2279, 2294, 57 L.Ed.2d 117 (1978). Beyond any doubt, "Congress intended endangered species to be afforded the highest of priorities." *Id.* at 174, 98 S.Ct. at 2292. "The plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost." *Id.* at 184, 98 S.Ct. at 2297. The ESA reflects "an explicit congressional decision to require agencies to afford first priority to the declared national policy of saving endangered species" and "a conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies." *Id.* at 185, 98 S.Ct. at 2297.

### Federal Agency Responsibilities Under the ESA

The heart of the Endangered Species Act lies in Section 7, 16 U.S.C. § 1536, which sets forth certain requirements for all federal agencies whose activities may impact endangered species or their critical habitats. Section 7(a)(1) *requires all* federal agencies to "utilize their authorities in furtherance of the purposes of [the ESA] by carrying out programs for the conservation of endangered species." 16 U.S.C. § 1536(a)(1). Section

7(a)(2) contains a *mandatory* "consultation" requirement:

> *Each* Federal agency *shall,* in *consultation* with and with the assistance of the Secretary [of the Department of the Interior], *insure that any action authorized, funded, or carried out* by such agency (hereinafter in this section referred to as an "agency action") *is not likely* to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, ..., to be critical

16 U.S.C. § 1536(a)(2) (emphasis supplied).

Section 7(a)(2) of the ESA contains both procedural and substantive requirements. *Thomas,* 753 F.2d at 763. The procedural requirements of Section 7(a)(2), which are designed to ensure agency compliance with the substantive provisions, require all federal agencies to assess the effects of their actions on endangered species in such areas where such species may be present. *Id.* at 764. As the *Thomas* Court held:

> [S]trict substantive provisions of the ESA justify *more* stringent enforcement of its procedural requirements, because the procedural requirements are designed to ensure compliance with the substantive provisions. The ESA's procedural requirements call for a systematic determination of the effects of a federal project on endangered species. If a project is allowed to proceed without substantial compliance with those procedural requirements, there can be no assurance that a violation of the ESA's substantive provisions will not result. The latter, of course, is impermissible. *See TVA v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117.

*Id.* (emphasis in original).

The substantive provisions of Section 7(a)(2) make it clear that *all* federal agencies also have a mandatory obligation to *ensure* that "agency actions" are *not likely* to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat. 16 U.S.C. § 1536(a)(2).

Regulations implementing the consultation procedures are codified at 50 C.F.R. Part 402. These regulations, in pertinent part, set forth the following definitions relevant to the instant case:

> *Action* means *all* activities or programs *of any kind* authorized, funded, or carried out, *in whole or in part,* by Federal agencies in the United States or upon the high seas. Examples include, but are not limited to:

> .    .    .    .    .

> (b) *the promulgation of regulations;*

> (c) the granting of licenses, contracts ... permits, or grants in aid; or

> (d) actions *directly* or *indirectly* causing modifications to the land, water, or air.

> .    .    .    .    .

> *Effects of the action* refers to the *direct and indirect effects* of an action on the species or critical habitat, *together with* the effects of other activities that are *interrelated* or *interdependent* with that action, that will be added to the environmental baseline. The environmental baseline includes the *past and present impacts of all Federal, State, or private actions and other human activities in the action area,* the anticipated impacts of all proposed federal projects in the action area that have already undergone formal or early section 7 consultation, *and the impact of State or private actions which are contemporaneous with the consultation in progress.* Indirect effects are those that are caused by the proposed action and are later in time, but still are reasonably certain to occur. Interrelated actions are those that are part of a larger action and depend on the larger action for their justification. Interdependent actions are those that have no independent utility apart from the action under consultation.

> *Jeopardize the continued existence* means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduc-

tion, numbers, or distribution of that species.

50 C.F.R. § 402.02 (emphasis supplied).

Consultation between the action agency and the USFWS is designed to answer such critical questions as whether the project or activity may proceed as planned, whether it should be halted, whether it should be modified to avoid impacts on a given species, or whether these impacts should be accepted and an exemption granted permitting the project to proceed. *See generally* 50 C.F.R. Part 402. The consultation process is designed to facilitate the resolution or prevention of potential conflicts between programs and endangered species conservation early in the process. *See, e.g.,* 16 U.S.C. § 1536(c)–(d); *see also,* 124 Cong.Rec. 131–135 (July 17, 1978) (statement of Senator Culver).

The consultation process is triggered when a federal agency ("action agency") undertakes *any* activity which *could* impact an endangered species or threaten its critical habitat. 16 U.S.C. § 1536(a)(2). The agency taking the action must assess the impacts of the agency action on the listed species and consult with the USFWS to assure the agency's compliance with the ESA. *Sierra Club v. Marsh,* 816 F.2d 1376, 1379 (9th Cir.1987). After reviewing the potential impacts of the agency action, the USFWS issues a "biological opinion," detailing how the agency action affects the species. 16 U.S.C. § 1536(b)(3)(A). Following the USFWS' issuance of the biological opinion, the agency must then determine whether and in what manner to proceed in light of its Section 7 obligations and the USFWS' biological opinion.

The primary responsibility for ensuring that federal projects do not harm endangered species or their habitats rests with the USFWS. *Sierra Club,* 816 F.2d at 1379.

50 C.F.R. § 402.14 requires that once a determination is made that an endangered species exists in the area where the agency action occurs, and that the agency action *may* affect the listed species, formal consultation is required. The only exception to this stringent requirement comes when the action agency and the USFWS, either after the agency prepares a biological assessment or as a result of informal consultation, agree that the agency action is not likely to affect any listed species or critical habitat. 50 C.F.R. § 402.14(b)(1). This exception to the rule regarding consultation requires written concurrence by the Director of the USFWS as to the lack of impact of the agency's action. *Id.* The USFWS may request formal consultation at any time it determines a federal action may have an impact in listed species. *See* Testimony of USFWS Field Supervisor David Wesley ("Wesley Testimony").

The term "agency action" is interpreted broadly. *Conner v. Burford,* 848 F.2d 1441, 1453 (9th Cir.1988), *cert. denied,* 489 U.S. 1012, 109 S.Ct. 1121, 103 L.Ed.2d 184 (1989); *False Pass v. Clark,* 733 F.2d 605, 611 (9th Cir.1984) ("The ESA applies to every federal action."); *see also Tennessee Valley,* 437 U.S. at 173 & n. 18, 98 S.Ct. at 2291 & n. 18 (including within the term "actions" agency projects already underway when the ESA was passed, and noting that the language of Section 7 "admits of no exception").

Both direct and indirect agency actions are subject to consultation. *National Wildlife Federation v. Coleman,* 529 F.2d 359 (5th Cir.) ("The fact that the private development surrounding the highway ... does not result from direct federal action does not lessen [the federal agency's] duty under section.), *cert. denied,* 429 U.S. 979, 97 S.Ct. 489, 50 L.Ed.2d 587 (1976); *see also False Pass,* 733 F.2d at 611 (consultation must insure that *direct and indirect* effects of agency action will not jeopardize listed species); *Riverside Irrigation District v. Andrews,* 758 F.2d 508, 512 (10th Cir.1985) (agency must consider *total impact* of project on listed species); *Conner,* 848 F.2d at 1452 (Section 7 requires preparation of biological opinion analyzing *all phases* of agency action); *North Slope Borough v. Andrus,* 642 F.2d 589, 608 (D.C.Cir. 1980) (agency must look at *all ramifications* of its action).

The preamble to the Section 7 regulations makes it clear that the applicable threshold for triggering formal consultation is very low:

The threshold for formal consultation *must be set sufficiently low* to allow Federal agencies to satisfy their *duty* to "insure" under Section 7(a)(2). Therefore, the *burden is on the Federal agency* to show the absence of likely, adverse effects to listed species or critical habitat as a result of its proposed action in order to be excepted from the formal consultation *obligation....*

*Any possible effect,* whether beneficial, benign, adverse, *or of an undermined character,* triggers the formal consultation requirement, as suggested by one commenter.

51 Fed.Reg. 19,949–950 (June 3, 1986) (emphasis supplied).

Once the "possible effects" become known to the federal agency, the consultation requirements are mandatory:

Every agency is required to review its programs and *all other activities* to determine whether any of its actions *possibly* affect endangered or threatened species or their habitats. [50 C.F.R.] § 402.04(a)(1). *Once an agency has discovered that some action for which it is responsible crosses the low threshold of possible effect,* it must consult formally with the Fish and Wildlife Service.... Finally, biological opinions not only address possible [substantive] violations of [Section] 7(a)(2), but more generally recommend conservation measures designed to mitigate or remove all adverse effects on an endangered or threatened species. These recommendations pertain to the statutory responsibility of agencies to carry out "programs for the conservation of endangered species ... 16 U.S.C. § 1536(a)(1)."

*Romero–Barcelo,* 643 F.2d at 857 (emphasis supplied).

### The National Flood Insurance Program

Congress established the National Flood Insurance Program ("NFIP") with the passage of the National Flood Insurance Act of 1968. 42 U.S.C. §§ 4001, *et seq.* The NFIP was subsequently broadened and modified with the passage of the Flood Disaster Protection Act of 1973 ("the Act") (Pub.L. No. 93–234, 87 Stat. 975 (codified in scattered sections of 42 U.S.C.)).

The NFIP is a federal program, administered and implemented by FEMA, which enables private property owners to purchase federal flood insurance. The NFIP is designed to provide an insurance alternative to disaster assistance to meet the escalating costs of repairing damage to buildings and their contents caused by floods and was, until recently, generally unavailable from private-sector insurance companies. 44 C.F.R. § 59.2

The NFIP is based on an agreement between local communities and the federal government which states that if a community implements measures to reduce future flood risks to new construction in Special Flood Hazard Areas ("SFHA"), the federal government will make flood insurance available within the community as a financial protection against flood losses which do occur. Before FEMA will make this insurance available, communities are required to adopt land-use ordinances designed to reduce future losses by restricting new development in flood hazard areas. 42 U.S.C. § 4002(b)(3) (1982).

The NFIP allows FEMA to make federal flood insurance available only in those areas where the appropriate public body of the community has adopted adequate land use regulations for its flood-prone areas. A "community," for purposes of the NFIP, is defined as "any state, area, or political subdivision ... which has the authority to adopt and enforce floodplain management ordinances for the area under its jurisdiction." 44 C.F.R. § 59.1.

Monroe County, Florida, the last remaining habitat of the endangered Florida Key deer, has in fact adopted such a land-use ordinance so that it may receive the benefits of the NFIP as a regulated community. Final Stipulation of Fact, at 4–5, ¶ 6. There is no other source of generally available commercial or residential flood insurance in the Florida Keys other than federal flood insurance issued by FEMA. *Id.* at 5, ¶ 6.

Participation by a community in the NFIP can significantly affect current and future

property owners in the community's floodplains and the availability of federal financial assistance in the flood-prone areas of the community. For example, if a community chooses not to participate in the NFIP, federal assistance such as Veterans Administration (VA) loans or mortgages from a federally insured or regulated bank are prohibited if the building used to secure the assistance is in a SFHA. 42 U.S.C. § 4012(a). The National Flood Insurance Act also prohibits other federal agencies such as the Federal Housing Administration and the Small Business Administration from making or guaranteeing a loan secured by a building in a SFHA unless flood insurance has been purchased. *Id.* Federal flood insurance cannot be purchased for buildings in non-participating communities. 42 U.S.C. §§ 4022, 4106.

Moreover, if a presidentially-declared disaster due to flooding occurs in a non-participating community, no federal financial assistance can be provided for permanent repair or reconstruction of insurable buildings in SFHAs. 42 U.S.C. § 4106.

The Flood Disaster Protection Act requires the purchase of federal flood insurance as a condition of receiving any form of federal or federally-related financial assistance from any federal agency for public or private land acquisition or construction purposes in any area identified by FEMA as a SFHA within any community participating in the NFIP.

If a community elects not to participate in this federal program, residents of that community face significant consequences: no federal financial assistance for home or business acquisition or construction, or flood disaster relief from any federal agency or federal instrumentality responsible for the supervision, approval, regulation, or insuring of banks, savings and loan associations, or similar institutions. Participating communities that fail to diligently implement or enforce these local land use restrictions are subject to probation or suspension from the NFIP. 44 C.F.R. § 59.24.

### The Florida Key Deer

The endangered Florida Key deer is a geographically isolated subspecies of the Virginia white-tailed deer known to occur only on the islands of the Lower Keys within Monroe County, Florida. Final Stipulation of Fact, at 2, ¶ 1. A unique and exquisite creature standing a mere 25–30 inches tall, the Key deer evolved as a distinct subspecies because of its restriction to a fragile island ecosystem with limited resources. *Key Deer Recovery Plan,* Plaintiffs' Exhibit 1.

The impact of human development decimated the Key deer population in the early part of the Twentieth Century, and by the middle of this century, the USFWS estimated that only 26 Key deer remained. *Id.* The imminent demise of the species led to establishment of the National Key Deer Refuge in 1957 and subsequent listing of the Key deer as an endangered species in 1967. *See* 50 C.F.R. § 17.11(h) (1988). The Key deer was subsequently afforded further protection under the Endangered Species Act of 1973, 16 U.S.C. §§ 1531, *et seq.*

Although the Key deer population grew to approximately 400 animals by 1978, the population has now declined to approximately 250–300. Final Stipulation of Fact, at 2, ¶ 1. Despite the USFWS' efforts, habitat destruction and human-related mortality threatens the recovery of the Key deer. *Id.* Recognizing that continuing development of the Florida Keys seriously imperils both the Key deer and its habitat, the USFWS has established as a recovery objective the goal of simply preventing further population decline and preservation of its integrity as a subspecies within its range. Recovery Plan, at 16.

Big Pine Key is the core of the Key deer range, as approximately two-thirds of the current population inhabit Big Pine Key and the adjacent No–Name Key during some part of the year. *Id.* at 8; Final Stipulation of Fact, at 2–3, ¶ 2. The Key deer may not be able to recover as a species without protection of adequate habitat on Big Pine Key. *Id.* Current federal land holdings in the Florida Keys are inadequate to provide sufficient habitat for the continued existence of the Key deer. Wesley Testimony. The USFWS is in competition with private development for land acquisition for Key deer

recovery. *Id.* The more habitat that is developed, the less likely the Key deer will recover. *Id.* The speed or rate of development is therefore a definite factor in the recovery of the Key deer. *Id.*

Between 1973 and 1984, vehicle-induced mortality (road kills) contributed to 83% of all deaths of the Key deer. Recovery Plan, at 11. At that time, the "yearly average of 45 road kills [was] considered to equal most if not all of the yearly production of fawns in a herd of 250–300." *Id.* The number of annual road kills of the Key deer has remained relatively constant. *Id.*, while the population has been slowly decreasing at a rate of about 2.5% per year. When additional natural and miscellaneous causes of death are factored in (*e.g.*, natural mortality, dogs, poaching, and drowning), it is apparent that the population is steadily declining in a spiral towards extinction. Wesley Testimony. Human interaction with the deer, such as increased development (and concomitant loss of crucial habitat) and increased highway use (and associated road kills), poses an ever-growing threat to the very existence of these critically endangered creatures. Wesley Testimony.

Currently, approximately 79% of the total Key deer habitat on Big Pine Key is privately owned. Final Stipulation of Fact, at 3, ¶ 4. As of 1985, over 1,275 of the total 6,712 acres on Big Pine Key had been developed, *id.*, mostly for vacation and single family homes. Approximately 1,409 acres on Big Pine Key are publicly owned, and contained in the Key Deer Refuge. *Id.* Therefore, approximately 4,027 acres, or 60% of all Key deer habitat on Big Pine Key, are vacant, private lands slated for future development. *Id.* Because of enormous growth in human population and the associated land use changes, there is now significant change in deer movement, behavior, and habitat use. Recovery Plan, at 10–15.

The USFWS has determined that the greatest threat to the continued existence of the Key deer is human encroachment—specifically, the direct loss and/or restriction of available habitat as a result of developmental pressure. *Id.* at 10, 16; Final Stipulation at 3, ¶ 3. Secondary factors associated with development, including road kills of Key deer, are equally detrimental to the Key deer's survival. *Id.* at 9–10 ¶¶ 18–20. The USFWS has also determined that:

> With the continuing development of the Florida Keys, both the Key deer and their habitat are still in peril. The gradual Key deer population decline recorded during the past six years re-emphasizes the fact that delisting will more than likely never be possible. Therefore, the focus of the recovery actions is on the prevention of a further decline of the Florida Key deer and the preservation of its integrity as a subspecies within its range.

> The major threats to the Key deer continue to be habitat destruction and associated human activities and disturbances. To ensure the future survival of the Key deer, adequate habitat must be provided and protected. The condition of the population and the habitat must be continuously monitored to maintain an appropriate balance. Due to the fragile nature of an insular ecosystem, manipulation and/or disturbance of the habitat should be kept to a minimum.

Recovery Plan, at 16–17. A significant amount of loss of habitat through commercial and residential development of undeveloped buildable lots on Big Pine Key poses a threat to the preservation and protection of the Key deer. Final Stipulation of Fact at 9.

### The USFWS' Factual and Policy Determinations that FEMA's Implementation of the NFIP Promotes and Encourages New Development that Adversely Affects the Key Deer

The USFWS has made numerous factual and policy determinations, at the highest level of the USFWS, representing the agency's best professional judgment, based on the views of experts on its staff and a review of available information, that implementation of the NFIP by FEMA facilitates and encourages new development in undeveloped areas.

On August 24, 1984, the Associate Solicitor of the United States Department of Interior issued an official policy determination on the issue of whether the consultation requirements of Section 7 apply to the issuance of

federal flood insurance under the NFIP. Memorandum of the Associate Solicitor, U.S. Department of the Interior, August 21, 1984, Plaintiffs' Exhibit 5. In finding that FEMA is obligated to initiate formal consultation if the NFIP may affect a listed species, the Associate Solicitor stated:

> Thus, in making its decisions on whether to determine eligibility for particular communities to participate in the flood insurance program, FEMA must follow the provisions of the National Flood Insurance Act, and it must also insure that its actions that indirectly or directly authorize or subsidize construction or acquisition in flood plain areas are not likely to jeopardize listed species or result in the destruction or adverse modification of critical habitat. The implicit approval of construction or acquisition and the issuance of flood insurance to make available needed financing for such projects clearly involve the de facto authorization of such actions by FEMA; "but for" the all pervasive activities of FEMA, development in flood plains would probably not take place. Therefore, the activities of that agency are covered by Section 7(a)(2) of the Act.

*Id.* at 6–7. (footnote omitted). Thus, the Department of the Interior has determined that Section 7 of the ESA does apply to FEMA's activities in implementing the NFIP when listing species may be affected by new development.

Having determined that the major threat to the continued existence of the Key deer is the continuing loss of habitat due to residential and commercial development, Recovery Plan, at 10, and that implementation of the NFIP by FEMA within the remaining habitat of the Key deer encourages and facilitates this development, the USFWS formally requested FEMA to initiate consultation pursuant to Section 7(a)(2) of the ESA. Final Stipulation of Fact, at 5, ¶ 7; p. 8, ¶ 13.

In correspondence from the USFWS to FEMA dated August 11, 1989, USFWS states:

> It is our belief that FEMA's issuance of flood insurance [in Monroe County] encourages development to occur in Key deer habitat. Without Federal flood insurance,

development would be much less attractive. Unregulated development is not compatible with Key deer survival. FEMA's responsibility under the ESA requires that your [FEMA's] actions be reviewed relative to impacts on threatened and endangered species.

> The Fish and Wildlife Service feels that FEMA has not fulfilled its requirements under the Act.

Letter from USFWS Field Supervisor David J. Wesley to FEMA, Plaintiffs' Exhibit 2.

FEMA responded to the USFWS' official request for consultation on September 8, 1989. Letter from FEMA to Mr. Wesley, Plaintiffs' Exhibit 3. In this response, FEMA's Associate General Counsel summarizes FEMA's position on its obligations under the ESA:

> It is FEMA's position that the [ESA] does not apply to the National Flood Insurance Program at all.

> ... [b]ecause FEMA does not authorize, fund or carry out any actions that in any way expressly jeopardize endangered species, section 7(a)(2) does not apply to FEMA.

> For this reason, FEMA does not fall within the purview of the Endangered Species Act ...

*Id.* at 1–2.

Subsequent to this exchange of correspondence, on September 20, 1989, Mr. Wesley referred the matter to the USFWS Assistant Regional Director for further action. *See* Memo of Mr. Wesley, Plaintiffs' Exhibit 4. In that correspondence, the USFWS Field Supervisor states:

> Attached is a copy of the letter I recently received from [FEMA] in response to my request for Section 7 consultation of the impact of the [NFIP] on the endangered Key deer. As you see, FEMA contends that the Endangered Species Act "... does not apply to the National Flood Insurance Program at all" and that my request for consultation is "... clearly without merit."

.     .     .     .     .

We view the availability of flood insurance as a stimulus to growth. . . .

At this point, I have done all I can do. I don't believe another letter from me is appropriate as they have stated their interpretation of the law. This matter should be referred to our Solicitor's office for response to FEMA. I encourage you to raise this at the Regional or Washington Office level as I firmly believe the NFIP as managed under FEMA is a federal action that requires Section 7 consultation.

The USFWS and its parent agency, the U.S. Department of Interior ("DOI"), have made numerous statements to Congress during the past five years regarding the effects of federal flood insurance on development. USFWS Field Supervisor David Wesley[1] testified that these statements were relied on to support the USFWS position that the NFIP provides an incentive for development, and that FEMA was required to consult with the USFWS pursuant to Section 7 of the ESA. Wesley Testimony.

In 1988, the DOI prepared a report for Congress on the Coastal Barrier Resources System ("CBRA"), Public Law 97–348, 16 U.S.C. §§ 3501–3510, describing the effects of the NFIP on new development. *See* Coastal Barrier Resources System, Executive Summary, Plaintiffs' Exhibit 13. In the CBRA Report Executive Summary, the DOI states:

> Cost considerations such as [those associated with the NFIP], along with environmental and safety concerns, led to the enactment of [CBRA] in 1982. This legislation was specifically designed to restrict federally subsidized development of undeveloped coastal barriers along the Atlantic and gulf coasts in order to:
>
> (1) minimize the loss of human life,
>
> (2) reduce the wasteful expenditure of Federal revenues, and
>
> (3) reduce damage to fish and wildlife habitat and other valuable natural resources of coastal barriers.

**The CBRA prohibits,** within the undeveloped, unprotected coastal barriers of the Coastal Barrier Resource System (CBRS), **most expenditures of Federal funds which encourage development. The intent of the CBRA is to remove from undeveloped coastal barriers Federal incentives for new development,** *such as National Flood Insurance* . . .

*Id.* at 3 (emphasis added).

On August 2, 1989, USFWS staff testified to a congressional subcommittee on the effects of the availability of federal flood insurance in promoting new development. *See Coastal Barrier Improvement Act of 1989; Hearing on H.R. 2840 Before the Subcomm. on Fisheries and Wildlife Conservation and the Environment and the Subcomm. on Oceanography and the Great Lakes of the House Comm. on Merchant Marine and Fisheries,* 101st Cong., 1st Sess. 30 (1989) (Statement of USFWS Coastal Barrier Coordinator), Plaintiffs' Exhibit 8. During that sworn testimony, USFWS staff testified that, based on a USFWS review of 186 units in the CBRA system, no substantial new development occurred in 176 of those units after federal flood insurance was prohibited. *Id.* Moreover, the USFWS testimony continued, the USFWS was "confident" that in the 10 CBRA units where substantial development did occur, the "vast bulk of that development occurred in these 10 units occurred during the one-year grace period . . . when landowners could still receive new federal flood insurance." *Id.*

This study of the relationship between the availability of federal flood insurance and new development within CBRA areas was subsequently relied on at the highest levels of the USFWS to support the USFWS' position that FEMA is subject to the consultation requirements of Section 7 of the ESA. USFWS Field Supervisor David J. Wesley testified that USFWS Director John Turner relied on this factual data during a high-level meeting with FEMA Administrator C.M. "Bud" Schauerte regarding this litigation. Wesley Testimony.

1. Mr. Wesley was offered as an expert witness on the administration and implementation of the ESA, as well as the consultation process under Section 7 of the ESA. The Court finds Mr. Wesley's testimony credible.

The substance of that meeting was memorialized in subsequent correspondence between Messrs, Turner and Schauerte. In correspondence to USFWS Director Turner dated November 13, 1990, *specifically referencing the instant case*, Administrator Schauerte writes:

Finally, you mentioned at the meeting that your staff has evidence that supports your position that flood insurance does lead to increased development, and we requested a copy of any such evidence. Because of the dire threat that the litigation at issue poses to the continued existence of the NFIP, we want to pursue this question as vigorously as possible.

Letter of Mr. Schauerte to Mr. Turner, Plaintiffs' Exhibit 6.

Director Turner responded to this request for evidence in a letter dated December 27, 1990:

Concerning evidence that flood insurance leads to increased development, our experience with the Coastal Barrier Resources System (System) shows the importance of flood insurance for development. As you know, private lending institutions are unwilling to make loans for development if flood insurance is not available. Most areas in the System are still undeveloped primarily because private landowners cannot obtain this insurance. A review of the 1986 units included in the System in 1982 indicated that only 10 units have subsequently undergone significant development. We believe that much of this development occurred after passage of the Coastal Barrier Resources Act in 1982 and before October 1983 when the prohibition on federal flood insurance for units within the System became effective. (Landowners had a 1-year grace period after the enactment of the law when they could still obtain flood insurance.) Many more of the areas would be developed if they were not in the System.

As we discussed at our November 2 meeting, the Fish and Wildlife Service is available to consult with your agency on the administration of the National Flood Insurance Program in the Florida Keys.

Letter of Richard Smith (for Director Turner) to Mr. Schauerte, Plaintiffs' Exhibit 7 (emphasis supplied).

The USFWS, using its best professional judgment, based on the views of experts on its staff and other available information, made a factual determination that there was sufficient evidence that FEMA's implementation of the NFIP was encouraging development in Key deer habitat, causing adverse impacts on the Key deer, and warranting initiation of Section 7 consultation. Wesley Testimony.

Pursuant to USFWS interpretation of the ESA and its own regulations implementing Section 7, the USFWS determined that FEMA facilitates and encourages development in Key deer habitat by providing a guarantee for flood insurance. Wesley Testimony.

Pursuant to USFWS interpretation of the ESA and its own regulations implementing Section 7, with regard to FEMA's obligation to initiate consultation, it is immaterial that private flood insurance companies would provide private flood insurance should federal flood insurance become unavailable in Key deer habitat. As long as FEMA is actually providing federal insurance, irrespective of whether some other private company was willing to provide private insurance, the USFWS would still require FEMA to consult. Wesley Testimony.

Pursuant to USFWS interpretation of the ESA and its own regulations implementing Section 7, with regard to FEMA's obligation to initiate consultation, it is immaterial that some level of development would still occur if no flood insurance was available in Key deer habitat. Wesley Testimony.

Pursuant to USFWS interpretation of the ESA and its own regulations implementing Section 7, with regard to FEMA's obligation to initiate consultation, it is immaterial that the NFIP is not subsidized by FEMA. Wesley Testimony.

Pursuant to USFWS interpretation of the ESA and its own regulations implementing Section 7, once the USFWS formally requests a federal agency to initiate consultation, the agency has no authority to deny

that request, and must enter into consultation. Refusal to consult after a formal request by USFWS violates the ESA. Wesley Testimony.[2]

Pursuant to USFWS interpretation of the ESA and its own regulations implementing Section 7, the USFWS has determined that its discussions and meetings with FEMA regarding the NFIP and its effects on the Key deer constitute "informal consultation" as that term is defined in 50 C.F.R. § 402.13, and that, pursuant to those regulations, FEMA has no authority to unilaterally terminate the consultation process. Wesley Testimony.

Pursuant to USFWS interpretation of the ESA and its own regulations implementing Section 7, the USFWS required Section 7 consultation with the U.S. Farmer's Home Administration (FHA) in 1980 because FHA was providing a loan guarantee for upgrading a water pipeline providing drinking water to the Florida Keys. The USFWS required consultation because of the *potential* that the project would encourage new development that *could* affect the habitat of endangered species. Even though the FHA did not approve, construct, or authorize new development; that other private sources of drinking water were available; and that stopping the pipeline would not preclude all new development, these factors were immaterial to FHA's duty to consult. Wesley Testimony.

Pursuant to USFWS interpretation of the ESA and its own regulations implementing Section 7, the USFWS also required Section 7 consultation with the U.S. Rural Electrification Administration (REA) in 1983 because REA was funding construction of an electrical substation to provide additional electricity in the Florida Keys. *Id.* at 38–43. The USFWS required consultation because of the *potential* that the project would encourage new development that *could* affect the habitat of endangered species. Even though the REA did not approve, construct, or authorize new development; that other private sources of electricity were available; and that stopping the substation would not preclude all new development, these factors were also

immaterial to REA's duty to consult. Wesley Testimony.

### *Deference to USFWS's Original Factual and Policy Determination that FEMA's Implementation of the NFIP is Subject to Section 7 Consultation*

Congress delegated responsibility for administering the ESA, including Section 7, to the USFWS. 16 U.S.C. § 1536; 50 C.F.R. § 402.01(a)–(b). It is a well-established principle of law that an agency's construction of a statute it is entrusted to administer is entitled to great judicial deference if the construction is reasonable and does not conflict with congressional intent. *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 131, 106 S.Ct. 455, 461, 88 L.Ed.2d 419 (1985); *Chevron, U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984), *reh'g denied*, 468 U.S. 1227, 105 S.Ct. 28, 29, 82 L.Ed.2d 921 (1984); *Southern Motor Carriers Rate Conference v. United States*, 773 F.2d 1561, 1567 (11th Cir.1985).

■ Not only should a reviewing court defer to any reasonable construction by an agency of its enabling statue, but even greater deference is in order when a court is reviewing the agency's interpretation of its own regulations. *Texas Mun. Power Agency v. Administrator of EPA*, 836 F.2d 1482, 1488 (5th Cir.1988) (citing *Udall v. Tallman*, 380 U.S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965), *reh'g denied*, 380 U.S. 989, 85 S.Ct. 1325, 14 L.Ed.2d 283 (1965)). An agency's construction of its own regulations is entitled to heightened deference if the interpretation is reasonable, regardless of whether the court would have arrived at the same interpretation independently. *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 566, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1980). The agency's construction may be discounted "only if clearly unreasonable," *Kahlenberg v. Immigration and Naturalization Service*, 763 F.2d 1346, 1349 (11th Cir. 1985), *mandate recalled on other grounds*, 796 F.2d 1327 (11th Cir.1986), or "is plainly erroneous or inconsistent with the language

---

**2.** Indeed, in Mr. Wesley's vast experience with other federal agencies, FEMA is the first agency

to refuse to consult with the USFWS after being requested to do so under Section 7 of the ESA.

and purposes of the regulation." *Parker v. Bowen,* 788 F.2d 1512, 1518 (11th Cir.1986) (en banc) (citing *United States v. Larionoff,* 431 U.S. 864, 872, 97 S.Ct. 2150, 2155, 53 L.Ed.2d 48 (1977)).

■ The USFWS has made a well-reasoned factual determination that FEMA's actions in implementing the NFIP within the remaining habitat of the endangered Key deer is a federal agency action that is subject to the consultation requirements of Section 7. Accordingly, the USFWS correspondence to FEMA requesting initiation of consultation was an interpretation of its own regulations. *See* 50 C.F.R. Part 402. As noted by the Ninth Circuit in *Sierra Club,* 816 F.2d at 1388, since the USFWS has promulgated the regulations implementing Section 7 of the ESA, its construction of these regulations is owed substantial deference. In *Sierra Club,* the court overturned a decision of the trial court that failed to defer to a decision of the USFWS that reinitiation of consultation was warranted because the USFWS was "the agency with the more appropriate expertise." 816 F.2d at 1388.

### Other Evidence that Flood Insurance "May Affect" Development that is Harming the Key Deer

Mr. Wesley, Plaintiffs' expert witness on the Section 7 consultation process, gave his expert opinion on FEMA's responsibility pursuant to Section 7. Mr. Wesley testified that, based on more than 15 years of experience in working with Section 7 consultations, his knowledge of the ESA and USFWS regulations, and his personal involvement in thousands of Section 7 consultations with dozens of federal agencies, in his expert opinion FEMA's implementation of the NFIP in the remaining habitat of the Key deer encourages new development that harms the Key deer. Wesley Testimony. It is Mr. Wesley's expert opinion that FEMA's failure to consult formally with the USFWS violated Section 7 of the ESA. The Court finds Mr. Wesley's testimony persuasive.

Plaintiffs' expert witness, Mr. Lynn Kephart, an expert in land development and land development trends in Big Pine Key and Monroe County, Florida, testified that avail-

ability of federal flood insurance in Monroe County has a definite effect on the rate or amount of development on Big Pine Key. Kephart Testimony. All banks and lending institutions require flood insurance before they will provide financing, so availability of flood insurance affects the availability of institutional financing. Kephart Testimony. Without financing, undeveloped land probably won't be purchased. Kephart Testimony. Most everyone Mr. Kephart has dealt with in his experience used institutional financing. Kephart Testimony. Had federal flood insurance not been available, all other things being equal, most people that build new houses in Big Pine Key would have been unable to do so without institutional financing. Kephart Testimony.

If federal flood insurance were replaced with private flood insurance at higher annual premiums, as little as 40 percent higher, that would cause less development in the area. Kephart Testimony. If flood insurance were not available on Big Pine Key and the only people who could build new houses were people who did not need institutional financing, the rate of new development "would slow considerably, to almost nothing, probably." Kephart Testimony. If developers don't meet minimum building criteria imposed by FEMA on Monroe County, they would not be able to obtain a building permit. Kephart Testimony.

Plaintiffs' expert witness, Mr. David S. Tackett, an expert in banking and the loan-making process in Monroe County, Florida, testified that if flood insurance were not available to Monroe County it would be an "imprudent banking practice" to continue to provide funding for residential mortgages. Tackett Testimony. In Mr. Tackett's expert opinion, banks in Monroe County would stop making residential and commercial financing available for construction in Monroe County if flood insurance were not available. *Id.*

Plaintiffs' fact witness, Ms. Joyce Newman, testified from her own personal knowledge regarding the requirements of obtaining federal flood insurance as a precondition to obtaining a construction loan for new development in Big Pine Key. Deposition

Transcript of Joyce Newman, June 8, 1992, submitted in lieu of trial testimony. Ms. Newman testified that she has lived on Big Pine Key for 17 years, and owns two properties there. *Id.* at 4–5. In 1977, Ms. Newman applied to First Federal Bank of the Florida Keys for a construction loan to build a residence on one of her properties. *Id.* at 15. Ms. Newman testified that First Federal required her to secure flood insurance as a prerequisite to obtaining the construction loan, and was required to show proof of flood insurance prior to being able to take the first draw on the construction loan. *Id.* at 15–16. In order to satisfy this precondition, Ms. Newman did in fact obtain a flood insurance policy prior to commencing construction. *Id.*

Ms. Newman also testified that, without bank financing, she would not have been able to build her home, and that without federal flood insurance, the bank would not have provided that financing. Continued Deposition Transcript of Joyce Newman, June 9, 1992, at 4–5.

### Congressional Findings Relating to Federal Flood Insurance

Congress has recognized a causal relationship between federal flood insurance and new development as one of the primary reasons for enacting the NFIP. In enacting the NFIP, Congress made the following findings and declaration of purpose:

(a) The Congress finds that—

... (2) *the availability of Federal loans, grants, guaranties, insurance, and other forms of financial assistance are often determining factors in the utilization of land and the location and construction of public and of private industrial, commercial, and residential facilities;* ...

(b) The purpose of this Act, therefore, is to

... (3) require States or local communities, as a condition of future Federal financial assistance, to participate in the flood insurance program and to adopt adequate flood plain ordinances with effective enforcement provisions consistent with Federal standards to reduce or avoid future flood losses; and

(4) require the purchase of flood insurance by property owners who are being assisted by Federal programs or by federally supervised, regulated, or insured agencies or institutions in the acquisition or improvement of land or facilities located or to be located in identified areas having special flood hazards.

42 U.S.C. § 4002 (emphasis supplied).

Congress has recognized that the availability of federal financial assistance, including federal flood insurance, is often the "determining factor" in the use, location, acquisition and development in floodprone areas, and has specifically made such assistance contingent on participation in the NFIP. Congressional findings of fact on cause and effect are entitled to great judicial deference. *Norman v. Baltimore & O.R. Co.,* 294 U.S. 240, 309–15, 55 S.Ct. 407, 417–19, 79 L.Ed. 885 (1935). This principle is particularly true where, as in the instant case, Plaintiffs' standing to sue is in issue. *See Autolog Corp. v. Regan,* 731 F.2d 25, 26, 31 (D.C.Cir.1984); *International Ladies' Garment Workers' Union v. Donovan,* 722 F.2d 795, 811–12 (D.C.Cir.1983) ("[A]s Congress passed the Act partly to provide redress to employers from unfair competition, the suggestion that effective enforcement of the Act will not have this effect directly contravenes the congressional judgment underlying the Act."); *Animal Welfare Institute v. Kreps,* 561 F.2d 1002, 1010 (D.C.Cir.1977) ("Congress, in enacting the MMPA, established as a matter of law the requisite causal relationship between American importing practices and South African sealing practices."), *cert. denied,* 434 U.S. 1013, 98 S.Ct. 726, 54 L.Ed.2d 756 (1978)

### Affirmative Obligations Under Section 7(a)(1) of the ESA

Section 7(a)(1) of the ESA imposes an affirmative obligation on all federal agencies to "utilize their authorities in furtherance of the purposes of [the ESA] by carrying out programs for the conservation of endangered species and threatened species." 16 U.S.C. § 1536(a)(1). Similar mandates are laid down in other sections of the ESA. *See* ESA §§ 2(b), (c), and 3(3), 16 U.S.C. §§ 1531(b), (c), and 1532(3). Courts have recognized

that ESA Section 7(a)(1) imposes on all federal agencies affirmative obligations to conserve threatened and endangered species. *See Pyramid Lake Paiute Tribe v. U.S. Dept. of Navy,* 898 F.2d 1410, 1416–17 (9th Cir.1990); *Carson–Truckee Water Conservancy Dist. v. Clark,* 741 F.2d 257, 261–62 & n. 3 (9th Cir.1984), *cert. denied,* 470 U.S. 1083, 105 S.Ct. 1842, 85 L.Ed.2d 141 (1985).

The terms "conserve" and "conservation" as used in the ESA, mean "to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to [the ESA] are no longer necessary." 16 U.S.C. § 1532(3).

■ FEMA has failed to consider or undertake *any* action to fulfill its mandatory obligations under Section 7(a)(1), and is therefore in violation of that provision of the ESA. Indeed, FEMA has *refused* to consult with the USFWS even after formal request to do so. FEMA's actions, and inaction, violate Section 7 of the ESA.

### Availability of Private Flood Insurance

■ In enacting Section 7 of the ESA, Congress has placed certain responsibilities on federal agencies, such as FEMA, that it hasn't placed on the private sector. The assertion that private insurance companies would likely step in and provide flood insurance for new development is irrelevant to whether FEMA is required to fulfill its responsibilities under the ESA. *Duke Power,* 438 U.S. at 76–79, 98 S.Ct. at 2632–33.[3]

Even if the potential availability of private flood insurance were relevant, private insurance is significantly different than federal flood insurance in that (1) individual applications could be turned down (*Kronenwetter Deposition* at 40), and (2) the rates could be as much as ten times the cost of federal flood insurance. *Id.* at 45. These differences would have a significant effect on the rate

---

[3]. FEMA argues that if no federal flood insurance was offered, private companies would do so and development would continue in the Key deer habitat areas. As Mr. Wesley testified, and as this Court has found, such considerations are immaterial to whether or not FEMA's actions in

and amount of development in coastal areas. Kephart Testimony. FEMA's witnesses were unable to state either that private flood insurance would definitely be offered in the Keys, or, if it were offered, under what conditions, to whom, or at what price. *Kronenwetter Deposition,* at 59.

The differences between federal and private flood insurance are significant enough so as to create a substantial likelihood that the rate and amount of development would be affected by a change from federal to private flood insurance programs. Kephart Testimony. The potential availability of private flood insurance in Monroe County, if the NFIP were rescinded, is a speculative and meritless argument which does not negate FEMA's obligations under the ESA.

### Construction of 50 C.F.R. § 402.03

■ There is no express or implied exemption in the ESA for "non-discretionary involvement or control." The provisions of Section 7(a)(2) expressly apply to "*any* action authorized funded or carried out" by federal agencies. In *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978), the U.S. Supreme Court addressed this very point:

> One would be hard pressed to find a statutory provision whose terms were any plainer than those in § 7 of the Endangered Species Act. Its very words affirmatively command *all* federal agencies "to insure that actions authorized, funded, or carried out by them do not jeopardize the continued existence" of an endangered species.... *This language admits of no exception.*

*Id.* at 173, 98 S.Ct. at 2291 (emphasis supplied).

The legislative history of the ESA makes it clear that all federal agencies must comply with the ESA with respect to all actions they authorize, fund, or carry out:

> administering the NFIP in Monroe County—currently the *only* source of flood insurance in the area, and required by all financial lending institutions—are likely to jeopardize the existence of the endangered Key deer.

The purpose of the bill [enacting the ESA] included the conservation of the species and of the ecosystems upon which they depend and every agency of government is committed to see that these purposes are carried out ... [T]he agencies of government can no longer plead that they can do nothing about it. They can, and they must. The law is clear.

119 Cong.Rec. 42,913 (1973) (remarks of Rep. Dingell).

The preamble to the Section 7 regulations indicates that the language on "discretionary Federal involvement or control" contained in 50 C.F.R. § 402.03 pertains to *geographical* limitations, rather than discretion to administer the federal activity. In its entirety, the pertinent preamble section states:

*Section 402.03 Applicability*

This section, which explains the applicability of Section 7, implicitly covers Federal activities within the territorial jurisdiction of the United States and the high seas as a result of the definition of "action" in a § 402.02. The explanation for the scope of the term "action" is provided in the discussion under § 402.01 above.

51 Fed.Reg. 19937 (June 3, 1937) (emphasis added).

A construction of § 402.03 as being a limitation on the geographical discretion of federal agencies is the only construction that is compatible with the statutory provisions of Section 7 and the legislative history of the ESA.

■■■ Even assuming that 50 C.F.R. § 402.03 limited the applicability of Section 7(a)(2) to "discretionary federal involvement or control," the Court finds that FEMA does in fact have ample discretion to implement the NFIP in a way that is compatible with the ESA.

In enacting the National Flood Insurance Action (NFIA), Congress gave FEMA broad discretion to "issue such regulations as may be necessary to carry out the purpose of this Act." 42 U.S.C. § 4128(a). The NFIA also gives FEMA broad discretion to establish specific criteria of eligibility for communities to participate in the NFIP. *Id.* § 4012(c).

FEMA has done so, at 44 C.F.R. Part 60, *Criteria for Land Management and Use.* These federal regulations specifically set forth criteria for local land use regulations that, at a minimum, communities must adopt in order to participate in the NFIP. These local land use regulations must be legally-enforceable, applied uniformly throughout the community on all public and private lands, and the community must provide that the regulations take precedence over any less restrictive conflicting local laws, ordinances or codes. *Id.* § 60.1(b). Monroe County has adopted such local regulations in order to meet FEMA's eligibility criteria for land management and use. Monroe County Ordinance No. 015–1990.

In addition to adopting regulations setting criteria for land management and use, FEMA has also adopted regulations to implement the Council on Environmental Quality's (CEQ) regulations, 40 C.F.R. §§ 1500.1 *et seq.*, which in turn implement the requirements of the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.* FEMA's regulations, entitled "Environmental Considerations," provides "policy and procedures to enable [FEMA] officials to be informed of and to take into account environmental considerations when authorizing or approving major FEMA actions that significantly affect the environment of the United States." 44 C.F.R. § 10.1(a). FEMA's regulatory criteria, designed to determine whether its actions "significantly affect the environment," include FEMA's consideration of whether "an action will affect, in large measure, *wildlife populations and their habitats*, ..., *or delicate or rare ecosystems, including endangered species.*" *Id.* § 10.8(b)(2)(v) (emphasis supplied); *see also* § 10.8(e)(5).

FEMA's regulations also set forth FEMA's environmental policy:

FEMA shall act with care to assure that, in carrying out its responsibility, *including ... flood insurance, it does so in a manner consistent with national environmental policies.* Care shall be taken to assure, consistent with other considerations of national policy, that *all practical means and measures are used to protect, restore, and*

*enhance the quality of the environment,* to avoid or minimize adverse environmental consequences, and to attain the objectives of

. . . . .

(3) *[a]chieving a balance between resource use and development within the sustained carrying capacity of the ecosystem involved."*

*Id.* § 10.4(a) (emphasis supplied).

Similarly, in response to Executive Order 11990, 42 Fed.Reg. 26961 (May 24, 1977), signed by President Carter, FEMA adopted regulations for the protection of wetlands. 44 C.F.R. Part 9. FEMA's policy under this regulation includes: taking no action unless the requirements of this regulation are complied with; *avoiding direct and indirect support* for floodplain development and *new construction in wetlands* wherever there is a practical alternative; and *preserving and enhancing the natural values of wetlands.* 44 C.F.R. § 9.2 (emphasis supplied). "Actions" are defined as *"any* action or activity including . . . *conducting Federal activities and programs affecting land use." Id.* § 9.4 (emphasis supplied). "Natural Values of Floodplains and Wetlands means the qualities of or functions served by floodplains and wetlands which include, but are not limited to . . . (b) *living resource values* (fish, *wildlife,* plant resources and *habitats." Id.* Moreover, these regulations apply to *"all* [FEMA] actions which have the *potential* to affect floodplains or wetlands, . . ."* including *"the direct or indirect support of new construction in wetlands." Id.* § 9.5(a).

FEMA regulations also provide:

The provisions set forth in this regulation are not applicable to the actions enumerated below *except* that the Federal Insurance Administrator . . . *shall comply with the spirit of the [Executive] Orders to the extent practicable . . .*

(i) *The issuance of individual flood insurance policies* and policy interpretations; . . .

. . . . .

(iv) The *issuance of individual flood insurance maps* . . . and *map amendments."*

*Id.* § 9.5(f)(2) (emphasis supplied).

FEMA regulations also provide for ongoing cooperation between FEMA and local communities to control or influence development patterns within the community by requiring FEMA to prohibit individual federal flood insurance policies that are in violation of state or local restrictions on land development. The withholding of federal insurance is intended to assist local, municipal, or state government in discouraging or limiting development in certain areas of the community. *See,* Part 73, 44 C.F.R. § 73.3(a) (No new flood insurance shall be provided for any new property which the Administrator finds has been declared by a duly constituted State or local zoning authority or other authorized body, to be in violation of State or local laws, regulations or ordinances which are intended to discourage or otherwise restrict land development or other occupancy in flood-prone areas. (b) New and renewal flood insurance shall be denied to a structure upon a finding by the Administrator of a valid declaration of a violation).

The Court finds as a matter of law that FEMA has broad discretion to "issue such regulations as may be necessary to carry out the purpose of [the NFIP]," 42 U.S.C. § 4128(a), and, therefore, that 50 C.F.R. § 402.03 does not operate to exempt FEMA from the requirements of Section 7 of the ESA.

### Plaintiffs Have Adequately Identified the Action of FEMA Subject to Section 7 Consultation

Plaintiffs challenge FEMA's actions under the citizen's suit provision of the ESA, as those specific actions affect their demonstrated interest in the Key deer. Particularly, Plaintiffs are challenging FEMA's administration of the NFIP in Monroe County, Florida, as it may affect development that has a demonstrated adverse impact on the endangered Key deer, and thereby directly impairs the interests of the Plaintiffs and their members who enjoy the deer in its natural but limited habitat. This challenge to FEMA's actions clearly meets the specific-

ity requirements as set forth by the United States Supreme Court in *Lujan v. National Wildlife Federation,* 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990).

### Injunctive Relief

Plaintiffs have also sought injunctive relief against FEMA, requesting that the Court require FEMA to consult with the USFWS, and also to retain jurisdiction over this action to monitor any affirmative action to be undertaken by FEMA under Section 7. The "benefit of the doubt" should be given to an endangered species when deciding what course of action will best conserve such species. *Tennessee Valley,* 437 U.S., at 174, 98 S.Ct. at 2291. As noted by the Ninth Circuit in *Sierra Club,* 816 F.2d at 1384, "Congress has established procedures to further its policy of protecting endangered species. The substantive and procedural provisions of the ESA are the means determined by Congress to assure adequate protection. Only by requiring substantial compliance with the act's procedures can we effectuate the intent of the legislature."

█ Absent "unusual circumstances," an injunction is an appropriate remedy for violation of the ESA. *Thomas,* 753 F.2d at 764 (road as proposed may endanger the Rocky Mountain Grey Wolf); *see also Tennessee Valley Authority,* 437 U.S. at 169–172, 98 S.Ct. at 2289–91 (imminent violation of the ESA requires injunction relief). Refusal to enjoin an action which clearly violates the ESA tends to "ignore[ ] the 'explicit provisions of the Endangered Species Act' ... [when] [t]he purpose and language of the statute limit[s] the remedies available to the District Court; only an injunction could vindicate the objectives of the Act." *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 313–14, 102 S.Ct. 1798, 1804, 72 L.Ed.2d 91 (1982).

Although "almost all equitable remedies are discretionary, [in] the balancing of equities and hardships" involving endangered species, "the order of priorities" has been established by Congress to favor endangered species. *Hill,* 437 U.S. at 193–94, 98 S.Ct. at 2301. "Congress has spoken in the plainest of words, making it abundantly clear that the

balance has been struck in favor of affording endangered species the highest of priorities, thereby adopting a policy which it described as 'institutionalized caution.'" *Id.* at 194, 98 S.Ct. at 2302.

As the meaning of the ESA has been discerned and its constitutionality determined, the role of the judiciary is to enforce the law where enforcement is sought. *Id.* Thus, the Supreme Court determined that it would be inappropriate "to balance the loss of a sum certain—even $100 million [the Tellico Dam project]—against a congressionally declared 'incalculable' value [the snail darter], even assuming we had the power to engage in such a weighing process, *which we emphatically do not.*" *Id.* at 187–188, 98 S.Ct. at 2298 (emphasis added).

The Eleventh Circuit, in a case also involving threatened endangered species injury, stated: "Failure to grant the injunction, however, will cause irreparable injury to the appellants which outweighs the threatened harm to the appellees." *National Wildlife Federation v. Marsh,* 721 F.2d 767, 786 (11th Cir.1983). Thus, precedent in this Circuit clearly supports the congressional intent that the balance of the equities should favor an endangered species whenever the Endangered Species Act has been violated.

Injunctive relief serves the public interest where it furthers the clearly-expressed purposes of a statute, as in the present case. "Congressional intent and statutory purpose can be taken as a statement of public interest." *Johnson v. United States Dep't of Agriculture,* 734 F.2d 774, 788 (11th Cir. 1984) (social welfare laws). This court, quoting from *Walling v. Brooklyn Braid Co.,* 152 F.2d 938 (2d Cir.1945), has stated that "[g]ood administration of [a] statute is in the public interest and that will be promoted by taking timely steps when necessary to prevent violations even when they are about to occur or prevent their continuance after they have begun.'" *Louis v. Meissner,* 530 F.Supp. 924, 929 (S.D.Fla.1981).

█ Furthermore, any decision against issuing an injunction in an environmental case must be carefully weighed, as the protection sought may be rendered moot

through destruction of the resource during the appeals process should injunction relief not be granted. "A court's decision not to enjoin may not threaten the very existence of what Congress intended to preserve." *Northern Cheyenne Tribe v. Hodel,* 851 F.2d 1152, 1158 (9th Cir.1988).

 The Court has considered the arguments, both for and against issuance of an injunction against FEMA, and concludes that injunctive relief is appropriate, and that the proper scope of an injunction against FEMA is an Order directing FEMA to consult with the USFWS within thirty (30) days of the date of this Order.

Accordingly, FEMA shall formally consult with the USFWS within thirty (30) days of the date of this Order in compliance with Section 7 of the ESA.

## CONCLUSION

Based upon the foregoing, it is Ordered and Adjudged that

1. Plaintiffs' request for declaratory relief under the Endangered Species Act is **GRANTED.** The Court finds that the Federal Emergency Management Agency must consult with the United States Fish and Wildlife Service within thirty (30) days of the date of this Order to determine whether the implementation of its National Flood Insurance Program in Monroe County, Florida is likely to jeopardize the continued existence of the endangered Florida Key deer. Final Declaratory Judgment is hereby entered for Plaintiffs;

2. Plaintiffs' request for injunctive relief is **GRANTED IN PART.** The Court will retain jurisdiction over this action to enforce the consultation requirement imposed upon the Federal Emergency Management Agency by Section 7 of the Endangered Species Act with regard to its implementation and administration of the National Flood Insurance Program in Monroe County, Florida, and its effect on the continued existence of the endangered Florida Key deer; and

3. Plaintiffs shall submit their application for costs and attorneys' fees within twenty (20) days of the date of this Order.

**DONE AND ORDERED.**